I would like to reserve two minutes for rebuttal and I see the clock so I'll keep my eye on it. Your Honor, Mr. Beng is currently serving a 70-month sentence after at trial presenting a corroborated defense that he did not knowingly enter the United States or voluntarily remain there. For the government's part, it presented a trial of multiple other acts of evidence that infected the jury's determination to the degree that the error was harmful and it does require reversal. I want to focus on the two errors that are related, yet separate, that I think either independently or together would require reversal in this case. And I'd like to start with the government's cross-examination of Mr. Beng. BENG-SALAZAR Okay, but a threshold question is it's still the government's burden to establish that there was a deportation and a reentry. Isn't that right? BENG-SALAZAR That's correct, Your Honor, and I think the government cited the correct case law in Medina. For purposes of deportation, they have to prove that the individual was ordered deported, that that individual was physically removed, and then they obviously have to prove a reentry, even in a founding case. CHIEF JUSTICE ROBERTS Doesn't the 2001 order, in effect, cure any defects in the 1996 order or not? BENG-SALAZAR I wasn't aware from the government's case that they were claiming there were any defects in the 1996 order. CHIEF JUSTICE ROBERTS Well, I mean, arguable defects. BENG-SALAZAR Your Honor, the reinstatement would in no way cure any defects in an original order of deportation. A reinstatement doesn't make an original order, if there's a defect in it, any more valid. It's the order itself that is the only thing that has legal significance. CHIEF JUSTICE ROBERTS Well, when you rely on the reinstatement provision, it reinstates the earlier deportation or removal order. So to make sense to a jury, you need to explain. BENG-SALAZAR But you don't have to, Judge Pius, because the only thing they have to prove is that he was ordered deported and he was physically removed. And they proved that through documentation that he was ordered deported, was the terminology then, and physically removed in 1996. And to the degree that the government wanted to add some sort of narrative richness, and I don't think that this is important to at least proving that he was physically removed, we were willing to concede to stipulate that he was in fact physically removed. So I don't think that the order of reinstatement in any way assisted the jury in determining whether the 1996 order of deportation was valid, and certainly had nothing to do with whether he was physically removed. That was we were willing to concede that we attempted at every effort to stipulate to that. CHIEF JUSTICE ROBERTS Well, you're willing to concede, but I think you were going further, if I read the materials correctly, that you felt you could compel a stipulation under these circumstances. BENG-SALAZAR Well, Your Honor, even under old chief, the district court has to make an analysis. I don't think that analysis took place here to determine whether under 403 the stipulation would be sufficient. The government has to prove its case. But the government offered nothing to explain why it had to show that he was ordered deported, physically removed after being told not to return, and then coming back by showing evidence of a reinstatement order, and then showing that he was physically removed again. They offered nothing to explain why that was relevant, why that aided or assisted in their case of having to prove what under Medina is, an order of deportation in the physical order. CHIEF JUSTICE ROBERTS There's some hint that they were concerned about identity. Was there any issue over his identity in the prior deportation orders? BENG-SALAZAR There was absolutely no issue of identity. The documents that they submitted for the 1996 removal order had his fingerprint on it, and an expert testified, fingerprint expert testified, that that was him who was removed. CHIEF JUSTICE ROBERTS Did you offer to stipulate that he was the same person? BENG-SALAZAR The stipulation was that Mr. Beng was physically removed subsequent to the order. So, yes, that was part of the stipulation. So I don't see what the added value was, other than to put in evidence that has a serious potential, and in my opinion, did prejudice the jury. CHIEF JUSTICE ROBERTS Why did it prejudice the outcome? BENG-SALAZAR Because this is a case, and this is a rare case, where a knowing entry was at issue. A defense was presented, and it was essentially unrebutted defense that Mr. Beng did not knowingly re-enter the United States. At least in this case, it had a very prejudicial effect that was amplified by, and this is why I wanted to begin with the government's cross-examination, by its inquiry into the facts surrounding not only the 2001 re-entry, even if there was a 2001 re-entry, the cross-examination went into other prior entries, just like the 2001 re-entry, that had nothing to do with whether 18 miles from the nearest town in a desert between Algodones, which is 30 miles away, and Clexico, which is 18 miles away, whether he knew that he had entered the United States. All the evidence, even the government's only fact witness of the arrest is evidence of a desert with no barriers, no indication whatsoever that an individual would know that they had entered the United States. There were photographs introduced, maps. I would be happy to supply the court with those if it would help them understand that this had nothing to do with an individual who goes through Mexicali into a suburban home area in Clexico, or someone which was elicited at trial who goes through Tijuana, some 120 miles away in a different climate, whether they knew they had entered the United States on January 30th. What about the other evidence that was in the record? For example, when he is confronted by the immigration officer, the officer says, what are you doing here? And he says, I'm here illegally. Well, Your Honor, I don't think that that means that he knowingly entered illegally and remained here. What does a reasonable juror take from that? A reasonable juror should be able to take that when he sees an immigration officer, he knows what's happened. Mr. Bing was cornered between two fences. He didn't say I'm lost. Well, Your Honor, he actually testified that he did, that he told the officer that he was returning to Mexicali. That's a factual determination for the jury to determine. How about the use of his other, of his alias names? Your Honor, it's very important to note that at the time of his apprehension here, he gave the officer his true name. And that came out during the trial, didn't it, that he had used multiple names? But, Your Honor, if the question is what is the effect of having in the past used multiple names or having used, once he was at the station, informed that he was going to be criminally prosecuted another name,  which is whether he knowingly entered or voluntarily remained in the United States, that the agent himself, and this is in the record at 151, indicates that Mr. Bing Salazar, when he was apprehended right there in the field, gave his true name. So I don't think that there's any indication that at that moment Mr. Bing was lying or trying to conceal what the truth was. And I don't think it's required that he had to explain to the officer, certainly, everything that had happened at that point for a jury to consider the rest of his testimony to be true. Counsel, you're not pursuing the argument that 1326 is unconstitutional, are you, in light of Rodriguez-Lara? Or are you? I am, Your Honor. And I think it's simply stated that Apprendi does apply to 1326B and that it can't be fixed. This is an issue. And it's submitted in my briefs, and I'd like to save my time to address the trial issues. But, yes, I am still saying under Supreme Court authority that it is unconstitutional, 1326B. With respect to this sentence, are you asking for an amyline remand or for a vacating remand? I've asked for a full remand. I think the government's going to be willing to concede today for an amyline remand. But I think it's clear because, in my view, there was constitutional error that there should be a full remand. But, again, I would submit on my briefs on that. Thank you, Counsel. Good morning, Your Honors. Christopher Tenorio for the United States. May it please the Court, as an initial matter, this case had absolutely nothing to do with Rule 404B. And I can be specific. But more directly, I think it's important to note that what's been presented is absolutely misleading. There was never any offer to stipulate to the identity of Mr. Bang Salazar. The only thing that was offered, and this is from page 72, the excerpt of records, the district court asked, are you willing to stipulate as to the other parts that they are willing to prove? Which is the entry and all the... Exactly, the warnings, the document. And this was the person that was removed. And the answer was, and with regards to that, we are not. We are only stipulating that this occurred after. Certainly, the government has to prove that he was, in fact, removed. They can use the fingerprint or identification based on fingerprints that may have gone before this deportation. And at several points, it was suggested the fingerprints, you can use the 2001 warrant of deportation to compare the fingerprints. Because we're not conceding that this is him. It's just we don't want you to mention that it happened in 2001. What happened here is we were both literally going different directions. The government, from the beginning, said we are going to prove that he was physically removed in 2001. Because that was three years ago. This is where we can find the detention officer that physically saw him or can attest to that. Mr. Bing said, why don't you prove the 1996 and then you don't have to get into that. In fact, that will start looking like 404B evidence. Well, simply because we did not have the evidence to prove that physical removal in 1996. Now, they suggest that we did prove that, but at no point did we, nor could we, were we prepared. They said that we mentioned the 1990 or brought in the 1996 warrant of deportation. That's correct. And as is stated and recognized by both parties, that was to compare the fingerprints from that document and the 2001 document to show that this was the same person. The reference, the testimony to that evidence, the 1996 warrant of deportation was, this is a document that reflects an order of deportation and shows whether or not someone was deported. Never did he say he was deported. He was physically deported or anyone witnessed that. In closing, nothing was mentioned about a physical removal in 1996, much less a reentry between 1996 and 2001. And that is key because that is what Mr. Bing had said from the beginning that our concern is. We are concerned that there's going to be this implication that he reentered after 1996 and was deported and then reentered again in 2004. At no point does the government suggest that or point to that in his case in chief. Now, it did come out later when it was used as impeachment for his familiarity with the desert. And this is very important to note how that came out. Very specifically, Mr. Bing was asked if he was familiar with the desert. He said no. He was asked a little bit further, you entered before through the desert, correct? Never. And then finally, after a few questions, the only thing that was asked, you came in illegally after he denied it in 2001. And this was a good faith basis that was based upon the documents from the 2001 entry and was actually marked as exhibit number 15, that he had come through the desert near Calexico. He finally conceded, yes, there is desert surrounding Calexico between there and Indio, California, and that is why I was familiar with the desert. Then he went on to say, but my other entries, I came in legally. So it was pursued further. He says, okay, yes, I did enter illegally. And for asking about the desert entry, how did you enter? He said through Tijuana. As soon as he said Tijuana, no further questions were asked regarding the modes of entry because that was not relevant to the impeachment. That information, that evidence was brought in pursuant to Rule 608, not 404B, and the district court specifically recognized this is not 404B evidence as propensity evidence or as impeachment. We did not seek to admit any extrinsic evidence about that, nor to show that he acted in conformity therewith. There was no need to. Mr. Bing admitted that he entered illegally. The only question whether it was voluntarily or knowingly within the United States. So there was no need, nor was there any intent from the government to show that he acted in conformity with prior illegal entries. It was only to probe his lack of credibility and his familiarity with the desert in particular. In regards to the 404B that is alleged in the 2001 deportation, the record is very clear from the beginning the government had said we're going to prove the 2001 removal. The 96 documents are only to prove that as much as necessary and also to prove the various statements, the contradicting names that he's given, and also the thumbprints to prove the identity. Now, I believe what happened was at the beginning at the very first motion hearing on May 7th, counsel cited the Romo-Romo case, which he cited for the principle that, and I submit that it's the wrong principle. The Romo-Romo case says removal must be part of the deport itself. Therefore, if you're relying on the 1996 deportation proceedings, you must rely on the 1996 removal. And that's incorrect. All that's required are showing that the proceedings were valid and that he was subsequently removed as a direct result of that order that was obtained, and that's what we did. We proved the proceedings to show that it was legally valid, and then we showed the 2001 removal. Would you just address for a moment the harmless argument that he made or prejudicial argument that counsel made? Well, I think that evidence of guilt by its very nature is prejudicial. Now, whether or not it can or cannot come in is another question. The old chief case is not even applicable in that sense. In fact, old chief supports the government's position that we can present evidence that would more validly, more accurate or more colorfully show what we're trying to prove. There was no analysis here necessary because he was not willing to stipulate to any element of the offense, nor was he willing to stipulate to the identity. Let me be more specific. What evidence, even assuming there was any error here, what evidence shows that this was just harmless? Well, again, the evidence was not presented to show propensity. Mr. Bing had conceded that he had entered illegally, so other entries, evidence of other entries was not necessary. And in addition, in closing, at no point did the government say, see, he entered in after 1996, therefore he entered in 2001, nor was it mentioned that he was physically deported in 96 and physically deported in 2001. So the concentration was never to show a repeat of action in that regard. Well, what evidence was there for the jury to look at that would allow them to find that he knowingly entered, apart from these issues? It was the direct testimony of Agent Brookins who confronted him at the All-American Canal. And Mr. Bing also confirmed that they met. Mr. Brookins said he saw him behind the fence on the canal and said, how are you doing? And Mr. Bing's direct response was, fine, I'm here illegally. And there were photographs that were alluded to, aerial photographs of that area, an expansive desert between the U.S.-Mexico border and that canal entry, showing that there's definitely more than at least four miles into the United States from there. Finally, the government's decision, thoughtful decision in this case, was to present a 2001 removal. That warranted deportation had a photograph of Mr. Bing, a thumbprint, and a signature that he received it. That would have been three years prior to the date. And then we would have to go back because, and actually what we've since learned with the Morales-Escuero case, we could not rely solely on that reinstatement as a valid deportation. It was absolutely necessary to go back to 1996 to prove that the due process was met. But we did not point to that departure as the departure prior to the subsequent reentry. What about the sentencing issue here, Virginia, the last few minutes, seconds? Your Honor, we would submit to the court. If the court remands for resentencing, we can address that there. We believe that it will be the same sentence. No, I'm not. That's not the question. Okay. Is it an Ameline remand just to remand consistent with Ameline? Or he raised Apprendi and Blakely at the sentencing hearing. Is he entitled to a full remand? No. And a vacate and remand? I see. I'm sorry. And if not, why not? I'm starting to run. Yes. Apprendi does not stop this from us having to prove the deportation at trial. I believe that's a sentencing issue now. We know that the judge can decide that as a sentencing issue. It only needs to be remanded for sentencing to confirm that he thought that he was acting. That if he knew that the guidelines were not mandatory, that he could. Right. And do that. All right. Thank you, counsel.  Mr. Johnston, you have some reserved time. Thank you, Your Honor. Quickly, we did stipulate to identity. The record at page 116 indicates that we would stipulate that Mr. Bing did, in fact, leave the United States through the Nogales Court of Entry. Identity was not at issue, at least for purposes of stipulation. The government has said that this was not about 404B and its inquiry on Cross. I will ask this Court to look at United States v. Davenport, which is cited in my reply brief, which mandates reversal if, even with a good faith basis, if the government does not first inquire of the court outside the presence of the jury to establish to the court's satisfaction that those questions can be asked. The question itself creates reversal. Yeah, but when you have a situation where the door is open and this is used for impeachment, how does that arise? The door was not open, Your Honor. Look to the government's brief at page 21 where they say he testified extensively to not being familiar with the area north of Calexico or the surrounding environments of Mexicali. That has nothing to do with the area in dispute in this case. And the government doesn't even provide a citation for that. So the door wasn't opened in that sense. He argues under 608B that that's the appropriate analysis. This is 608B concerns character for truthfulness. I'm not even sure how that would apply in this case, whether a prior crossing somehow brings up truthfulness. But I think Davenport supports her position on that. I would just briefly in my last few seconds like to point to the court, Agent Brookins did not speak fluent Spanish. He indicated Mr. Bing was unlike 99% of the people that he has ever seen in these circumstances before, wholly cooperative, a very different case than a typical 1326. Thank you. Thank you, counsel.
judges: Hall, O'scannlain, Paez